UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Chaun Carridine,                                    Case No. 15-cv-4167 (JRT/FLN)

      Petitioner,
                                                    **ORDER AND**
v.                                                  **REPORT AND**
                                                    **RECOMMENDATION**
David Richous,

      Respondent.

_____

Chaun D. Carridine, *pro se*, for Plaintiff.
Linda Kay Jenny, Hennepin County Attorney's Office, for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on a Petition filed by Chaun Carridine under 28 U.S.C. § 2254 for writ of habeas corpus by a person in state custody (ECF No. 1), and Carridine's motions for discovery (ECF Nos. 15 and 20). This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons that follow, Carridine's motions for discovery are **DENIED**, and the Court recommends that Carridine's Petition (ECF No. 1) be **DENIED**.

## I. BACKGROUND

Carridine is currently serving a life sentence without the possibility of parole at the Minnesota Department of Corrections facility at Oak Park Heights, after a jury found him guilty of the premeditated-first-degree murder of Lorenzo Guffie. ECF No. 1 at 1–2; Opp'n Mem., ECF No. 9. The undersigned adopts the facts of this case as stated by the Minnesota Supreme Court:

> It is undisputed that Carridine shot Lorenzo Guffie on the night of June 3, 2007, outside of Palmer's Bar in the Riverside neighborhood of Minneapolis. As a result of the shooting, Guffie died at Hennepin County Medical Center the following morning. At trial, Carridine argued that he was acting in self-defense and that he did not intend to shoot Guffie.

. . .

On the day of the shooting, June 3, 2007, A.P. picked up Carridine at an apartment in the Riverside neighborhood and went to Palmer's Bar, a few minutes away from the apartment. They arrived at the bar around 11:00 p.m. As they were walking through the bar to the patio, Carridine saw Guffie and said he couldn't believe the "motherfucker" who robbed him was there and Carridine was without his gun. Carridine said he needed to call his brother to get his gun. Guffie was with his girlfriend, Lamonte White, Charles Bilbro, and four others. Guffie and his girlfriend had driven to Minneapolis with White from their home in Rochester to meet friends at Palmer's Bar.

Inside the bar, Carridine and Guffie began arguing. Guffie's associates, Bilbro and White, saw the argument, and Bilbro heard Carridine ask Guffie, "[w]hy you rob me?" Bilbro also heard Guffie tell Carridine to "[s]top saying I robbed you." There was no physical confrontation at that time. Bilbro and White successfully broke up the argument. A bartender also stepped in between Carridine and Guffie and asked what was going on. Carridine told the bartender that he was "gonna to whoop this nigga's ass."

After the argument, Guffie, Guffie's girlfriend, Bilbro, and White left the bar. Carridine left shortly thereafter. As Guffie, Guffie's girlfriend, Bilbro, and White were walking across Cedar Avenue to a parking lot, Guffie and Carridine continued their argument. Bilbro heard Carridine ask "why he robbed," and Guffie told him to "stop saying it." During the argument, Guffie stood in the street, while Carridine stood on the sidewalk on the Palmer's Bar side of the street. Guffie was moving away from Carridine, crossing the street, during the argument. Carridine started walking southbound on the Palmer's side of the street, while Guffie, Guffie's girlfriend, Bilbro, and White crossed the street to the parking lot.

L.W., P.S., and B.J. were outside the bar. They saw Carridine and A.P. arrive at the bar together and witnessed the argument outside the bar. Carridine told P.S. to "[c]lear the block," which P.S. interpreted to mean that there was going to be trouble. Meanwhile, Guffie was driving a car with his girlfriend, White, and Bilbro as passengers. Guffie backed out of the parking space and stopped at the entrance to the parking lot to wait for traffic to clear. Guffie's girlfriend and White saw Carridine walk up to the car and heard him say something before shooting at the car. Bilbro, who was unable to see the shooter, heard the shooter say something like, "get me some" or "pay me," saw a flash, ducked, and heard six or more gunshots. Guffie's car was moving forward in a swerving motion at the time of the shooting, and eventually crashed into a tree. After the crash, all of the passengers and Guffie left the vehicle and ran towards Palmer's Bar. White, who had a cell phone in his hand, dropped it somewhere between the car and Palmer's, and stopped to pick it up. Guffie, who had been shot, collapsed 30 feet from the bar. Bilbro called 911.

. . .

Carridine's testimony conflicted with that of the State's witnesses. He testified to the following at trial. On the day of the shooting, June 3, 2007, A.P. contacted Carridine to purchase drugs. A.P. picked up Carridine at his home in St. Paul and drove to an apartment in the Riverside neighborhood. After Carridine retrieved the drugs from the apartment, they went to Palmer's Bar, a few minutes away from the Riverside apartment. They arrived at the bar around 11:25 p.m., and Carridine had his handgun with him. As Carridine was walking through the bar to the patio, he recognized some men, Guffie, White, Bilbro, and four others—who he did not want to be around.

Carridine sat at the bar instead of going to the patio and was about to order a drink when Guffie approached and said, "I need to holler at you." After Guffie walked away and Carridine went to the bathroom to call for a ride, Carridine went back to the bar and attempted to order a drink when Guffie, White, and Bilbro approached him with a "hostile" attitude. They approached him from behind, and Guffie asked, "What's this shit I hear about you telling people that I'm a thief and I stick people up and I rob people." Carridine said he did not want any problems with Guffie or his companions, but after he turned his back, one of the three men hit him on the back of the head. A bartender stepped in between Carridine and Guffie and told them to break it up. As Guffie walked away, Carridine heard him say, "I'm going to lay your bitch ass down if you come outside." Carridine told the bartender that if "one of these motherfucking niggers put their hands on me again," he was "going to whoop one of their fucking asses."

After the argument with Carridine, Guffie, Guffie's girlfriend, Bilbro, and White left the bar. When Carridine left shortly thereafter, Guffie and his three companions were standing in the middle of the street challenging Carridine to come out in the street to fight with them. Carridine heard them say, "Let's take it to the street." Carridine responded by saying, "Leave me the fuck alone." After Guffie, Guffie's girlfriend, Bilbro, and White crossed the street toward the parking lot, Carridine started walking southbound on the Palmer's Bar side of the street.

As Carridine crossed Cedar Avenue near the entrance to the parking lot, a car swerved, sped up, and hit him below the knees as he dove out of the way. The car door opened, Guffie pulled out a gun and said, "I told you I was going to lay your bitch ass down." Carridine said he was scared, his leg hurt, and he had no choice but to use his gun because he did not have time to get away. Carridine shot at the car while he was still on his knees and continued shooting until the car drove away. Carridine said that he did not intend to hit anyone; his intent was to shoot at the door until the car door closed.

Guffie's girlfriend, Bilbro, and White denied having a gun, denied that Guffie had a gun, and denied that Guffie hit anyone with the car.

> . . .
>
> J.J. was on the patio of the Nomad Bar on the night of the shooting. From where he was standing, he could see Palmer's Bar and the "hubbub" on Cedar Avenue. He saw a group of "people hanging out" and thought that they were up to no good. One of the group received a call on his cellphone, and the group went around the corner. He lost sight of them and then saw flashes of gunshots coming from around the side of the building, heard a screech of tires, and saw a car hit a tree. There were three or four persons who left the vehicle, and one of them was holding his stomach or side. One of the persons who stepped out of the car may have had something in his hand. J.J. never testified that he saw a gun.

*State v. Carridine*, 812 N.W.2d 130, 134–36 (Minn. 2012).

The Minnesota Supreme Court affirmed Carridine's conviction on May 9, 2012. ECF No. 9 at 1–2; *Carridine*, 812 N.W.2d 130. Carridine then filed a petition for postconviction relief asserting error in the admission of impeachment evidence, prosecutorial misconduct, ineffective assistance of counsel, and newly discovered evidence. Carridine was summarily denied postconviction relief on all claims except for newly discovered evidence, which was ultimately denied after an evidentiary hearing on March 6, 2014. ECF No. 9 at 1–2; *see also State v. Carridine*, 867 N.W.2d 488, 491 (Minn. 2015). The Minnesota Supreme Court affirmed the postconviction court on July 29, 2015. *Carridine*, 867 N.W.2d 488.

Carradine now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Pet. for Habeas Corpus, ECF No. 1. In his Petition, Carradine raises nine grounds for relief, which fall under four broad categories: (1) ineffective assistance of trial and appellate counsel, (2) prosecutorial misconduct, alleging, *inter alia*, that the prosecutor failed to provide his trial counsel with requested discovery, (3) invalid grand jury indictment, and (4) abuse of discretion of both the trial court and court of appeals. *See generally id.* In response, Respondent states that "all of [Carridine's] instant claims appear to have been either addressed by the Minnesota Supreme Court, both implicitly and

4

explicitly, or found to have been procedurally defaulted/barred by the Minnesota Supreme Court."

ECF No. 9 at 8 (internal citations omitted).

After filing his Petition, Carridine also filed a motion to compel discovery from Respondent. Mot. to Compel, ECF Nos. 15 and 20. He specifically requests the following documents:

1. All warrants, and administrative subpoenas, that were used in conjunction with the retrieval of petitioner and Paine's cell phone records. It is petitioner's position that this information was never given to the defense.

2. All crime scene photographs, images, and/or videos in color as well as diagrams.

3. All photos in color that were shown to state witnesses LaShaun King/Williams and Ben Jones to identify state witness Lamont White aka Nathaniel White.

4. All crime scene reports including any handwritten notes, worksheets, or drawings.

5. Certified copies of the state witnesses' criminal backgrounds with photos of Ben Jones, LawShawn [sic] King/Williams, Latoya Graham, Charles Bilbro, Nathaniel White aka Lamont White.

6. Certified copies of the decedent's criminal background.

7. Autopsy reports, images[,] drawings[,] and documents.

8. Crime lab reports to include the formal reports and all back-up material including worksheets, bench notes, drawings[,] images, microscopic images, testing notes, video[,] or any other documentation that contains the data recorded from a forensic investigation and examination.

9. The data on all physical evidence which was presented (ballistic data, shooting angles trajectory, location of evidence, gunshot residue test, trajectory rod images[,] and/or diagrams)[.]

10. All police reports to include statements of witnesses, interviews, all audio, and/or video files, supplemental reports, evidence logs[,] and evidence sheets, and chain of custody reports[.]

ECF No. 20. Carridine states that he needs these materials "in order to expand the record as set forth

5

in Rule 7 of the Federal Rules of Civil Procedure." *Id.*

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth the standard that governs this Court's review of habeas corpus claims raised by state prisoners. The relevant portion of the AEDPA, 28 U.S.C. § 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district courts. The Court held that:

> [A] state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours . . . .
>
> Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 405, 413. The Court further explained the "unreasonable application" clause:

> A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable . . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court

> decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 411.

A writ of habeas corpus may also be available where the state court's resolution of a case is based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). In other words, habeas relief may be granted if the state court's judgment is based on findings of fact that could not reasonably be derived from the evidentiary record. When reviewing a state court decision, however, a "federal court . . . presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)).

Therefore, a federal district court is not permitted to conduct its own de novo review of a habeas petitioner's constitutional claims. Habeas relief cannot be granted unless the petitioner has identified, and substantiated, a specific error committed by the state courts. Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in *Williams*. Demonstrating actionable error requires that a petitioner, as a threshold matter, present a federal question in his petition for relief. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

### III. LEGAL ANALYSIS

**A.   Ineffective Assistance of Counsel (Grounds 1, 2, 3, 4, 7, and 8)**

    **1.   Ineffective Assistance of Trial Counsel**

Carridine alleges in Grounds One, Two, Three, Four, and Seven of the Petition, that his trial counsel was ineffective for failing to: (a) properly prepare a defense by reviewing evidence, including forensic reports, or by preparing to cross examine witnesses; (b) adequately investigate the case by failing to hire a private investigator, consult with an independent forensic expert, interview the States's witnesses including the State's forensic expert, interview possible defense witnesses, or request witness cell phone records; (c) suppress Carridine's cell phone records or other allegedly inadmissible evidence; and (d) challenge the validity of the Indictment. ECF No. 1 at 5, 7–8, 10, 19; Pet. Resp. Mem. 2–19, 26–31, ECF No. 25.

Carridine raised these claims of ineffective assistance of trial counsel in his postconviction petition. The postconviction court denied relief, concluding that his claim was procedurally barred. The Minnesota Supreme Court affirmed the postconviction court. *Carridine*, 867 N.W.2d at 492–93 (citing Minn. Stat. § 590.01, subd. 1 (2014) ("A petition for postconviction relief after a direct appeal has been completed may not be based on grounds that could have been raised on direct appeal of the conviction or sentence."); *State v. Knaffla*, 243 N.W.2d 737, 741 (1976) ("[W]here direct appeal has once been taken, all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief.")).

Notwithstanding the procedural bar, the Minnesota Supreme Court reviewed Carridine's ineffective assistance of trial counsel claim under the standards outlined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To prove ineffective assistance of counsel, Carridine must show that (1) his counsel's representation was so deficient that it fell below the standards guaranteed to him under the Sixth Amendment, and (2) that Carridine was prejudiced by his counsel's errors. *Id.* The Minnesota Supreme Court concluded that Carridine could

not satisfy the first prong of the *Strickland* test, as all of the enumerated errors of trial counsel alleged related to trial strategy. *Carridine*, 867 N.W.2d at 494–95. As to the second prong of the *Strickland* test, the court held that "even if his counsel successfully took all of the steps Carridine suggests, by conducting additional investigations, subpoening additional witnesses and phone records, and objecting to other evidence, Carridine has not shown that anything other than cumulative and non-material evidence would have been admitted." *Id.* at 495 (citing *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn. 2003)).

When presented with an ineffective assistance of counsel claim in the context of a § 2254 habeas petition, the question "is not whether a federal court believes the state court's determination under *Strickland* was incorrect but whether it was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). A state court is given significant latitude to reasonably determine that a defendant failed to satisfy the *Strickland* standard. *Id.*

The Minnesota Supreme Court's affirmance of the postconviction court's denial of relief on grounds of ineffective assistance of trial counsel was neither contrary to federal law—indeed the court applied federal law—nor based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Therefore, the Court concludes that Carridine is not entitled to federal habeas relief on Grounds One, Two, Three, Four, and Seven raised in his Petition.

### 2. Ineffective Assistance of Appellate Counsel

Carridine alleges in Ground Eight of his Petition that appellate counsel was ineffective by failing to submit Carridine's "*pro se*" supplemental brief, investigate any of his claims, and gather documents that Carridine requested. ECF No. 1 at 21. In considering Carridine's claim of appellate

counsel under *Strickland*, the Minnesota Supreme Court held that Carridine failed to show that counsel was ineffective under the first prong. *Id.* The Court concludes that this decision was neither contrary to federal law nor based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). While it does not appear that the Minnesota Supreme Court considered whether or not appellate counsel was ineffective for failing to submit Carridine's supplemental brief, it is clear to this Court that Carridine could not satisfy the first prong of *Strickland* on that basis. Appellate counsel did, in fact, submit a brief on Carridine's behalf and would not have been procedurally able to submit a supplemental brief. Even if counsel could have obtained leave of court to submit a supplemental brief authored by Carridine, this constitutes legal strategy which the Court concludes would not fall below the standard of representation Carridine was guaranteed by the Sixth Amendment. The Court concludes that Carridine is not entitled to federal habeas relief on Ground Eight.

**B.     Prosecutorial Misconduct (Grounds 5 and 6)**

In Grounds Five and Six, Carridine states that he is entitled to habeas relief on the basis of prosecutorial misconduct. ECF No. 1 at 16, 18; ECF No. 25 at 19–26. Carridine alleges that the prosecutor knowingly offered perjured testimony and committed a *Brady* violation. *Id.* In addressing this claim, the Minnesota Supreme Court held that "[e]ven if proven by a preponderance of the evidence, the facts alleged by Carridine do not show that the State deliberately offered perjured testimony or violated the rules of discovery." *Carridine*, 867 N.W.2d at 496. Additionally, the Minnesota Supreme Court noted that Carridine "has failed to allege any facts to support [his] argumentative assertion that the State possesses undisclosed reports or witness cell phone records." *Id.*

The Court "presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence." *Lee*, 222 F.3d at 442. Carridine has not put forward anything to meet his burden other than continuing to assert that the material is in the State's possession and that the record must be expanded to account for it. *See, e.g.*, ECF No. 25 at 1; ECF No. 20. The Court is bound by AEDPA to review the record before it and cannot lawfully give Carridine the "expansion of the record" he seeks. *Id.* Therefore, the Court must conclude that Carridine is not entitled to federal habeas relief on Grounds Five and Six raised in his Petition.

C.   **Invalid Indictment (Ground 7)**

Carridine alleges that the Indictment is invalid because the witnesses who testified at the Grand Jury proceedings offered perjured testimony. ECF No. 1 at 19; ECF No. 25 at 26–28. The Minnesota Supreme Court held that this claim was procedurally barred. *Carridine*, 867 N.W.2d at 497 n.5 ("Carridine also claims in his brief that his trial counsel was ineffective for failing to challenge Carridine's grand jury indictment. Carridine did not raise this claim below, and therefore we need not consider it."). The Court agrees with the Minnesota Supreme Court. However, even if the claim was not procedurally barred, Carridine has not put forward any evidence to support his claim that the prosecutor offered perjured testimony during the grand jury proceedings. Carridine cannot meet his burden to show by clear and convincing evidence that the indictment was invalid. *Lee*, 222 F.3d at 442. Carridine is not entitled to federal habeas relief on the ground that trial counsel was ineffective for failing to object to grand jury indictment as invalid. *See supra*.

D.   **Abuse of Discretion (Ground 9)**

Finally, Carridine asserts that the Minnesota courts "abused there [sic] discretion in allowing

11

a conviction to stand that is based on perjured testimony and the lack of competent trial counsel as well as appellate counsel." ECF No. 1 at 23; *see also* ECF No. 25 at 31–35. The Court, in concluding that Carridine is not entitled to habeas relief on any of the grounds raised in his Petition, further concludes that Carridine is not entitled to federal habeas relief on the ground that the courts abused their discretion.

E.   **Motion to Compel Discovery**[1]

Given that Carridine is not entitled to federal habeas relief, the Court concludes that his motion to compel discovery must be denied. Rules Governing Section 2254 Cases in the United States District Courts 6(a) ("A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery"); *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (holding that where Petitioner shows that he is likely entitled to habeas relief, he has shown "good cause" as required by Rule 6(a) for discovery); *Harris v. Nelson,* 394 U.S. 286, 300 (1969) ("[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry."). Carridine has not shown that he is entitled to habeas relief and therefore has not made the requisite good cause showing to be entitled to discovery

---

[1]

> On April 14, 2016, Carridine filed a motion to compel. *See* ECF No. 15. A month later, Carridine filed an amended motion to compel. *See* ECF No. 20. It is clear to the Court from the language in both documents that it is Carridine's intention to replace his original filing on his motion to compel discovery. The Court grants Carridine's implicit request to amend his original motion and concludes that the original motion to compel discovery (ECF No. 15) is denied as moot. The Court only addresses the merits of the amended motion (ECF No. 20).

under Rule 6(a).

## IV. ORDER

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Carradine's motion to compel discovery (ECF No. 15) is **DENIED as moot**; and

2. Carradine's motion to compel discovery (ECF No. 20) is **DENIED**.

## V. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Carradines's Petition Under 28 U.S.C. § 2254 for writ of habeas corpus by a person in state custody (ECF No. 1) be **DENIED**; and

2. This matter be **DISMISSED WITH PREJUDICE.**

DATED: July 5, 2016                                   *s/Franklin L. Noel*
                                                                        FRANKLIN L. NOEL
                                                                        United States Magistrate Judge


**NOTICE:**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation

will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.